UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL JOHN BRANCACCIO,

        Petitioner,

                                    CASE NO. 2:08-CV-14116

v.                          JUDGE LAWRENCE P. ZATKOFF

                                  MAGISTRATE JUDGE PAUL J. KOMIVES

MILLICENT WARREN,

        Respondent.

_____/

## REPORT AND RECOMMENDATION

| | | |
|---|---|---|
| I. | RECOMMENDATION | 2 |
| II. | REPORT | 2 |
| | A. *Procedural History* | 2 |
| | B. *Factual Background Underlying Petitioner's Conviction* | 4 |
| | C. *Standard of Review* | 14 |
| | D. *Sufficiency of the Evidence (State Court Brief Claim)* | 16 |
| |    1. *Clearly Established Law* | 16 |
| |    2. *Analysis* | 18 |
| |      a. Premeditated Murder | 19 |
| |      b. Felony Murder | 21 |
| | E. *Denial of Psychological Expert/Right to Present a Defense (Claim I)* | 23 |
| |    1. *Clearly Established Law* | 23 |
| |    2. *Analysis* | 25 |
| | F. *Coerced Confession/Miranda (Claim III)* | 30 |
| |    1. *Clearly Established Law* | 30 |
| |    2. *Analysis* | 33 |
| | G. *Evidentiary Claims (Claims IV and V)* | 36 |
| |    1. *Clearly Established Law* | 36 |
| |    2. *Analysis* | 37 |
| |      a. Other Acts Evidence (Claim IV) | 37 |
| |      b. DNA Evidence (Claim V) | 38 |
| | H. *Ineffective Assistance of Counsel (Claims II and IV-VI)* | 40 |
| |    1. *Clearly Established Law* | 40 |
| |    2. *Analysis* | 42 |
| |      a. Failure to Challenge Extradition (Claim II) | 42 |
| |      b. Failure to Challenge Other Acts Evidence (Claim IV) | 44 |
| |      c. Failure to Challenge DNA Evidence (Claim V) | 44 |
| |      d. Closing Argument (Claim VI) | 45 |
| | I. *Recommendation Regarding Certificate of Appealability* | 48 |
| |    1. *Legal Standard* | 48 |
| |    2. *Analysis* | 49 |
| | J. *Conclusion* | 50 |
| III. | NOTICE TO PARTIES REGARDING OBJECTIONS | 51 |

I.    <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus.

II.    <u>REPORT</u>:

A.    *Procedural History*

    1.    Petitioner Michael John Brancaccio is a state prisoner, currently confined at the Ionia Maximum Correctional Facility in Ionia, Michigan.

    2.    On January 21, 2005, petitioner was convicted of first degree premeditated murder, MICH. COMP. LAWS § 750.316(a); first degree felony murder, MICH. COMP. LAWS § 750.316(b); larceny in a building; and unlawfully driving away an automobile (UDAA), MICH. COMP. LAWS § 750.413, following a jury trial in the Ottawa County Circuit Court.[1]  On February 21, 2005, he was sentenced as an habitual offender, fourth offense, to a mandatory term of life imprisonment without possibility of parole on the murder conviction, and to a term of 60-180 months' imprisonment on the UDAA conviction.

    3.    Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

    I.    THE DEFENDANT WAS UNLAWFULLY DEPRIVED OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHEN TRIAL COUNSEL FAILED TO RAISE AND PRESERVE AN INSANITY OR TEMPORARY INSANITY DEFENSE AND WHEN HE FAILED TO CHALLENGE THE VALIDITY OF THE EXTRADITION WAIVER.

    II.    THE TRIAL COURT DEPRIVED THE DEFENDANT OF HIS DUE PROCESS AND EQUAL PROTECTION RIGHTS, AS WELL AS HIS OTHER PROTECTED CONSTITUTIONAL RIGHTS, TO A FAIR TRIAL

---

    [1]The premeditated and felony murder represented two theories supporting a single killing.  The two convictions were merged for sentencing purposes.  The larceny in a building conviction, which served as the predicate felony for the felony murder conviction, was vacated at sentencing on double jeopardy grounds.

WHEN IT UNLAWFULLY DENIED THE DEFENSE PRETRIAL
MOTION TO SUPPRESS THE STATEMENTS THE DEFENDANT
ALLEGEDLY MADE TO THE POLICE, WHEN AT THE TRIAL IT
PERMITTED THE ADMISSION OF OTHER-ACTS EVIDENCE, AND
WHEN IT FAILED TO INSTRUCT THE JURY AS TO HOW IT WAS TO
CONSIDER THE OTHER-ACTS EVIDENCE.

III.    THE TRIAL COURT DEPRIVED THE DEFENDANT OF HIS DUE
PROCESS AND EQUAL PROTECTION RIGHTS, AS WELL AS HIS
OTHER PROTECTED CONSTITUTIONAL RIGHTS, TO A FAIR TRIAL
WHEN IT UNLAWFULLY PERMITTED THE RESULTS OF DNA TESTS
TO BE ADMITTED INTO EVIDENCE WITHOUT A PROPER LEGAL
FOUNDATION FOR IT.

Petitioner filed a *pro per* supplemental brief raising three additional claims:

IV.    THIS COURT MUST REVERSE MICHAEL JOHN BRANCACCIO'S
CONVICTION FOR PREMEDITATED FIRST DEGREE MURDER ALSO
FELONY MURDER BECAUSE [THE] PROSECUTOR FAILED TO
PRODUCE SUFFICIENT EVIDENCE TO SUPPORT THE ELEMENTS
OF THESE CHARGES AND A VERDICT OF GUILTY BEYOND A
REASONABLE DOUBT, THUS VIOLATING HIS STATE AND
FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR AND IMPARTIAL
TRIAL.

V.    COUNSEL WAS INEFFECTIVE WHEN DURING CLOSING
ARGUMENTS COUNSEL CALLED HIS CLIENT A LIAR, THIEF AND
A KILLER.

VI.    THIS IS SUPPORT ISSUE FOR THE APPEAL OF RIGHT. (EXHIBIT A)
IS A LETTER ASKING FOR AUTHORIZATION FOR SPENDING A
MODEST AMOUNT OF MONEY FOR A PSYCHOLOGIST. THIS ISSUE
WAS BROUGHT UP IN THE ORIGINAL BRIEF ON ISSUE I.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. Brancaccio*, No. 263321, 2007 WL 189332 (Mich. Ct. App. Jan. 25, 2007) (per

curiam).

4.    Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan

Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard

3

order.  *See People v. Brancaccio*, 478 Mich. 928, 732 N.W.2d 925 (2007).

5.      Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on September 25, 2008.  As grounds for the writ of habeas corpus, he raises six claims: (1) ineffective assistance of counsel for failing to present an insanity defense and improper denial of funds for a psychological evaluation; (2) ineffective assistance of counsel for failing to challenge petitioner's extradition from Illinois; (3) involuntary confession; (4) improper introduction of other acts evidence; (5) improper admission of DNA evidence and related ineffective assistance of counsel in failing to object; and (6) ineffective assistance of counsel.  Because petitioner attaches to his habeas application his state court briefs, I assume that petitioner additionally intends to raise the sufficiency of the evidence claim that he raised in the state courts.

6.      Respondent filed her answer on June 8, 2009.  She contends that petitioner's claims are without merit.

B.      *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction arises from the August 2004 death of Richard Sullivan.  The voluminous evidence at trial was accurately summarized in the brief filed by petitioner's counsel in the Michigan Court of Appeals:

> Beginning in January 28, 2004, Larry Freeland owned a house and property at 362 Winterpine Way in Holland Township, Ottawa County, Michigan, with his life partner for 18 years, Richard Sullivan.  They owned another house in Saugatuck, Michigan, as well.  Freeland owed a 1997 Cadillac and is employed as a realtor in Douglas, Michigan.  Sullivan had a black Aztek he drove exclusively.
> Sullivan was an independent contract auditor who worked out of their home on Winterpine and who worked alone.  No one other than Freeland and Sullivan lived at either of their homes.  Sullivan's time working varied with the work he had to do balancing orders and amounts billed to his client companies.
> Typically, Freeland and Sullivan stayed at their Saugatuck cottage in the spring and summer.  Sullivan went during the day to their Holland Township house to work and the two met in the evening at their Saugatuck house for dinner.  They

routinely spoke by phone once or twice a day to plan dinner and talk about going to the grocery store.

After he showed a house in Holland on August 12, Freeland called Sullivan and asked if he wanted to meet him for dinner at the Beachwood Inn. They met at their Holland Township house and after dinner went to their Saugatuck house where they spent the night.

At about 6 a.m. the next day, August 13, 2004, Freeland got up, took a shower, got ready to go to work, left their house at 6:30 a.m., and at 7 a.m. met a woman at his office to prepare some documents for an 11 a.m. showing that morning. When Freeland left, Sullivan was in the kitchen making tea. He was planning to go to their Winterpine house to do an audit and also go to an office supply store to buy paper.

Freeland gave Sullivan a coupon for the paper he planned to buy. That was the last time Freeland saw his life partner alive.

As he waited outside while another realtor showed the house at around 11:15 a.m., Freeland on his cell phone called Sullivan. There was no answer, so he left messages on both Sullivan's cell phone and at their home. After the showing, Freeland called Sullivan again at 12:15 p.m., and still there was no answer. Freeland stopped at the grocery store, bought a newspaper, went to the Saugatuck house, fed their dogs, ate lunch, and went back to work.

Sullivan and his Aztek were not at the Saugatuck house when Freeland went there for lunch. Freeland showed a condo that afternoon and at around 4:55 p.m. from his office called Sullivan again. Freeland went to their Saugatuck cottage.

When he had not heard from Sullivan, Freeland left at about 5:55 p.m. a note to Sullivan telling him he was going to their Holland Township house and to call and stop him if he got the note so he did not have to go all the way there. He took one of their dogs with him. He tried to call Sullivan on the way toe their Winterpine house and arrived there at about 6:20 p.m.

Freeland did not see the Aztek as he drove up to the house. He thought Sullivan might be out for a few minutes to buy cigarettes and drove his Cadillac to the front of the garage. The garage door was closed, and a trash bin and garden hose that were normally kept in the garage were outside.

Leaving the dog in the car, Freeland went into the house and did not see anything out of place as he walked inside. He expected to find a note on the kitchen counter, but there was none. Walking into the laundry room, he saw clothes in the washer he recognized as from their Saugatuck cottage, which he tossed into the dryer.

Freeland saw that the service door from the garage to the outside was open. He saw cat feces by a sofa, which he said was "very unusual," and then saw one of their cats in "terrible distress" next to him. He continued to look around and found more cat feces before looking into a bedroom at the foot of the bed.

As he looked into the bedroom, Freeland saw Sullivan's feet on the floor. Sullivan had high blood pressure and had been advised by his doctor in a voice mail message to double the amount of the medication he was taking for it. Freeland

walked over to where he saw the rest of Sullivan's body.

He called 911. Sullivan was nude and his hands were tied behind his back. Freeland did not touch the body, and it was obvious from his color the 5' 7-1/2", 194-lb. Sullivan was dead. As he spoke to the 911 operator, Freeland saw a hutch door in the TV room was open and small cedar boxes Sullivan collected were strewn about in the room. The normally-neat area where Sullivan worked on the upper level of the house was not at all neat when Freeland saw it.

Later, the police showed Freeland some of Sullivan's personal property, like a Minolta camera, a watch, a ring, and a wallet, and some of his own property they recovered. He did not know how much cash Sullivan had the morning of August 13, 2004, and the two of them talked about storing cash in the Holland Township home. They never stored cash there to Freeland's knowledge.

Freeland said he did not know the defendant, but said one time a man they did not know opened the door from their garage and yelled out the name "Adam." Freeland said the restroom area of the Horizon Outlet Mall is known in the area gay community as a meeting place.

The first police officer to arrive at the Holland Township house, Ottawa County Sheriff's Deputy Robert Scarbrough, talked to the shaken Freeland outside before going inside the home and finding Sullivan's head jammed into a floor fan that had several of its "ribs" broken out. A paramedic deputy, Jack Seinen, soon walked into the room. Two other deputies helped look around the house to make sure no other victims or any suspects were there. They did not find anyone else in the house.

The police found several cabinets open and the contents of drawers spilled on the floor. A kitchen cabinet door was off the cabinet. Once they "secured" the outside, the police put up a crime scene tape and parked their patrol cars to block traffic on the road. They found no signs of forced entry at the house. Nor did the police find any identifiable fingerprints in the house matching the defendant.

After examining the body for signs of life and finding it cold, Seinen told Freeland that Sullivan was dead and comforted him in the foyer of the house. Later, Seinen was told by his lieutenant to help prepare a search warrant request on the house and returned after that with a signed warrant. He handed the warrant to detectives at the crime scene.

A pathology assistant and a medical examiner investigator for Ottawa, Muskegon, and Newaygo counties, Wavelet Sandra Thompson, collected and preserved evidence from the body and the scene for the forensic pathologist who did the autopsy. She arrived at the house at 11:16 p.m. on August 13, 2004, and found Sullivan's body face down on the floor in the master bedroom with his forehead just inside a fan that had a few of the plastic rungs on its bottom corner broken. She saw his hands tied loosely behind his back with about ten inches of play between his hands.

Because she considered it to be "a highly suspicious case," Thompson took photographs and looked at the body without touching it. She saw a tennis show lace that came up around the right side of his neck extending to the back and was still

6

attached to the shoe which was under his chest. His head was "hyperextended" and "kind of back." The lace from the other tennis shoe, which was found nearby on a seating area, was not in the shoe.

The autopsy was done in the forensics department at Blodgett Memorial Hospital by Dr. Stephen Cohle. Before the body was taken out of the house, Thompson had it place[d] back-up on a clean sheet. As the body was rolled onto the sheet, Thompson saw a piece of the shoelace stuck very tightly in the groove of the neck. Thompson matched the area of lividity in the neck with the shoe and shoelace and photographed it.

Thompson estimated the time of death was 2 p.m. within a couple of hours either way. She said there was extensive rigor mortis when she looked at the body. Before he was taken away, Thompson wrapped the hands in clean plastic bags secured by tape to preserve any trace evidence on them.

The Deputy Chief Medical Examiner for Ottawa County and Kent County's Chief Medical Examiner and a graduate of the University of Missouri at Columbia Medical School who trained at Baylor College of Medicine in Houston in pathology and who was qualified in court as an expert in forensic pathology, Dr. Cohle confirmed he performed the autopsy on Sullivan's body on August 14, 2004, at Blodgett Memorial Hospital in Grand Rapids, Michigan. The doctor said there was an imprint from a shoe on the neck and did not find anywhere on the body where the ligature had been attached tightly to it. Sullivan's wrists had been tied tightly twice each behind his back with a shoelace similar to the one that had been tied around his neck.

Dr. Cohle said a blister he found on Sullivan's right wrist showed he had struggled to get the lace off. He also found scrapes and bruises on the forehead, eyebrow, nose, left shoulder, left biceps area, and both knees. There were tissue injuries to the neck and pinpoint hemorrhages around both eyes and on the gums and mouth from a great deal of pressure from his neck being compressed that are consistent with strangulation. Dr. Cohle said the injuries were fresh, meaning they occurred just before death, and none were after death.

The forensic pathologist swabbed from the thigh and gave to Detective Dyke what he called "mucoid material." He said that upon death from any cause muscles in men may squeeze out some semen, but that does not mean anything as to the cause of death. Dr. Cohle concluded Sullivan died of asphyxiation by strangulation. He ruled his death a homicide.

Describing the amount of force and time needed for a person to lose consciousness, Dr. Cohle said it would have to be enough force to prevent blood flow to the brain fro about one to 1-1/2 minutes. He believed that what occurred here was strangulation by hands to the point Sullivan lost consciousness and after having his hands tied behind his back regains consciousness before being strangled to death by ligature. The doctor said it would have taken about 1-1/2 minutes for Sullivan [to lose] consciousness from manual strangulation and 3-4 minutes at a later time before the man would have died from the ligature strangulation and the amount of force "would be an adult person using I think a good portion of his or her strength in order

to maintain the ligature." He said, though, it would take less pressure if Sullivan's hand were tied behind his back, but it would still take the same amount of time.

The police thought the defendant may have been wearing gloves or may have wiped down the surfaces in the house he touched in explaining why they did not find in it any of his fingerprints. Limited by lab policy to no more than three items, the police submitted to the State Police crime lab for DNA trace testing against "persons of interest."

Meanwhile, about 15-20 miles west of Chicago in the city of North Riverside, Illinois, a community of close to 7,000 people, a police Lieutenant, Thomas Tauer, around 4 p.m. local time on August 13, 2004, went to a Kohl's store where he works as a part-time security guard. He was wearing his police department uniform at the store when he was called to the security office. There, he learned a white man and woman used a credit card to buy a comforter set and left the store. Tauer saw a tape showing the couple going through a brown wallet looking at ID and credit cards, then buy the comforter set and leave the store.

Then, Tauer saw on videotape a black Aztek pull up "again" and a man get out before walking into the store at a different entrance than the other man and the woman with him. The man got out with the same comforter set the other people had bought earlier and went to the customer service department to return it. As the man came down the escalator with nothing in his hands, Tauer got a good look at him. Tauer in court identified the man he saw in the store, who looked puzzled at seeing the police officer in the store and who walked past the Aztek in the parking lot.

Tauer called the North Riverside police station and talked to Lieutenant Robert Slak, who said that the Michigan license plate on the Aztek came back registered to Sullivan. He told him something suspicious was going on and saw the defendant walk past the Aztek in the parking lot that had in it the couple who had bought the comforter set. The defendant walked across the street, circled around, and then walked over to the Aztek which pulled up to where he was.

The police stopped the vehicle and brought a cashier from the Kohl's store, Sandra Rodriguez Liliana, to where they stopped the Aztek to identify the persons inside, saying the defendant was the front seat passenger. She believed the signatures on the American Express card used to make the purchase was similar to the one on the store's receipt. She said she did not see in the courtroom any of the persons who had made the purchase.

The Aztek's driver identified himself as Billy Hamilton, who the police saw had a brown wallet in his back pocket after the defendant on police orders got out of the vehicle. Slak told Hamilton to give him the wallet after the man said he did not have any identification with him. In the wallet Slak found Sullivan's driver's license and said the three people in the Aztek said nothing when he asked them whose vehicle it was.

The police arrested Hamilton when they found out he had a revoked driver's licence and handcuffed him as well as the woman passenger, Ivana Kulifajova. They stood the defendant up, handcuffed him, and sat him back down on the curb. Rodriguez identified Hamilton and Kulifajova as the couple who used Sullivan's

8

credit card to buy the comforter set. The police contacted another credit card company, Mastercard, and asked it to contact Sullivan and have him call them about his stolen cards. They did not receive a call from Sullivan. . . .

Seizing a Seiko watch the defendant was holding in his hands, the police took them to their station where they put him into a holding area before finding a gold-colored ring with the initials RCS on it. Slak called the Holland, Michigan, police, found out the Sheriff's Department was at Sullivan's house on a report of a dead person, and talked to the police about what had happened in Illinois.

The police found in the Aztek a receipt and a box of paper bought at the Holland Office Max Store. They also found drug paraphernalia and two cameras in the Aztek. The evidence was preserved and turned over later to detectives from the Ottawa County Sheriff's Department (OCSD).

An OCSD detective and the lead investigator, Tim Raha, took instant photographs of the crime scene to the North Riverside police station with Detective David Blakely where they met Slak and Detective Frank Schmalz. Raha and Blakely interviewed the defendant at the North Riverside police station where Raha said the defendant had slept all night, was given coffee, was wide awake, not under any physical distress, not intoxicated, and not under the influence of any drugs.

After they read him his *Miranda* rights and after he waived his rights, the defendant said to the detectives in a roughly four-hour interview, (1) he was married to his wife Dawn, has three children, lived in Michigan for eight years and before that in New York and New Jersey; (2) wondered why they came to Illinois about a stolen vehicle if it was involved in a robbery; (3) there was a wallet and ring found inside the vehicle; (4) he had met Hamilton at a place in Chicago called the "brickyard" two weeks before and they did heroin together 2-3 times a week; (5) he did not know Hamilton as Billy, but said his various nicknames were Shakey, Old Boy, Numbnuts, and Old Man; (6) he had come to Chicago the week the homicide took place on a Greyhound bus; (7) he had taken heroin with Hamilton all day Tuesday and Wednesday, having bought three bags of heroin; (8) he went back to Michigan by bus and met his "old lady" for a couple of hours before walking to his daughter's school where she had allegedly been assaulted; (9) he later took heroin with Hamilton in a ditch near Hope College; (10) he had left orange needle caps where they had shot the heroin and had gotten synthetic heroin at the brickyard and the needles as well in Chicago; (11) he had planned to meet Hamilton at an outlet mall in Holland at around 11 a.m. to 12:30 p.m., bought cigarettes from a gas station and said to get in they were going to Chicago; (12) Hamilton was supposed to have met him later the night before after they injected heroin near Hope College, but never showed up; (13) he had CDs he wanted to sell to WalMart, but ended up not having any to sell when the police asked him where they were; (14) he left several days a week when [he] began using heroin again to go to Chicago for heroin after being fired from a job with Red's Taxi in Holland and telling his wife he was working; (15) he denied killing Sullivan and ever being inside the house; (16) confronted with the claim he was lying after Blakely left the interview room, he said he stole the Aztek, but did not kill Sullivan; (17) after finding a wallet and a set of keys on a urinal in

the outlet mall's public restroom, he found the Aztek by trying the remote key on vehicles in the parking lot and then got inside it; (18) he said Hamilton had not been in Michigan with him; (19) there was jewelry on the seat(s) in the Aztek and from the mall he drove to Chicago where he met Hamilton and Kulifajova at the brickyard; (20) after using heroin, the three went to the Kohl's store so Hamilton could get some money; (21) after Hamilton and Kulifajova bought a comforter and some sheets on a credit card Hamilton had taken out of the wallet, they drove around to the other side of the store while the defendant went inside to return the items for a cash refund so they could buy heroin; (22) after he left the store and someone was following him, he walked past the Aztek and later got inside it before the police stopped and arrested them; and (23) he never asked for an attorney and did not look at Raha when the detective pressed him on any involvement he may have had in the Sullivan murder.  The police on August 26, 2004, took blood samples from the defendant on a search warrant signed by a district court judge for DNA comparison. The police sent the sample to the State Police crime lab.

The morning of Sunday, August 15, 2004, Schmalz came to work at the North Riverside police station where the defendant was in a lockup cell and went into a rage.  The inmate was screaming and swearing as well as throwing a mattress in the cell.  The detective confronted the enraged defendant, who was threatening to kill everyone over some tissues another police officer gave him that had fallen on the floor.  He told Schmalz he had hepatitis and would throw balled-up tissues he had urinated on at the officer, if he returned to the holding area, hoping to cause the officer's death.

Schmalz calmly offered to talk to the officer about the tissues and after he sat down, put his head in his hands for a few seconds, and looked up, the defendant said: "You're a standup motherfucker.  Most other places would come in here with six or seven guys and they would beat on me.  I respect you for come [sic] in here one-on-one, basically."  Schmalz found out the defendant during the interview the day before had asked for an attorney because he was fatigued and frustrated with the questioning.

The North Riverside police detective reminded the defendant, who said on Sunday morning he wanted to talk again to the Ottawa County detectives, he had asked for an attorney.  The defendant replied: "Fuck the attorney.  I want to talk to them."  Blakely and Schmalz talked to the defendant at around 11 a.m.  The defendant, who had signed waivers of his rights, said (1) he saw Sullivan in his black Aztek get out and walk by him after going into a store; (2) he talked to Sullivan who asked him what he did for a living, and he told him he was looking for work; (3) Sullivan said he might be able to get work for him at one of the businesses he owned, and the two of them left in the Aztek; (4) they ended up at Sullivan's house where the two went inside; (5) he heard a beep from a home alarm system with which he was familiar since he is a criminal and knows how alarms work; (6) after asking what he was into sexually and being told he was not into that and thought he was there for a job, Sullivan excused himself into a bedroom, closing the door; (7) after waiting for about 20 minutes in the living room and periodically asking in a loud voice if he

was going to come out, the defendant banged on the bedroom door and heard Sullivan say, "Come on in;" (8) he walked into the bedroom and saw Sullivan naked on the bed masturbating; (9) Sullivan asked him to join him, and the defendant said he was not into that; (10) the defendant became enraged and charged the bed, saying, "You want something, I'll give you something;" (11) then, he jumped on the bed and with his hands began choking Sullivan; (12) after Sullivan freed himself and fell onto the floor, the defendant put a chokehold on him until his face turned purple, he gurgled, and his body went lifeless; (13) he tied Sullivan up with shoelaces and robbed the house; (14) in the basement he heard thumping sounds upstairs and saw Sullivan had apparently moved and his head was inside a fan; (15) he took some money out of Sullivan's pants, grabbed his keys, and drove the Aztek to Chicago; (16) Sullivan had tried to fight back; (17) he took the comforter off the bed and put it in a Jacuzzi tub and soaked it with water; and (18) described what happened on the way to and in Chicago.

At around 5:30 p.m. on August 15, 2004, the police talked to the defendant's "common law wife," Dawn Ostrander, after they had agreed to let her talk to him. They took her from the Perkins Restaurant where she worked to their headquarters so they could set up a call to the police station in North Riverside. Ostrander without hesitation allowed the police to record her conversation with the defendant. She would not permit a third person to listen by headset to the conversation. The police complied. A tape of the 12-minute conversation was transcribed and the tape played for the jury.

A Cook County, Illinois, Sheriff's police investigator, Wayne Layer, on August 17, 2004, took the defendant to an extradition hearing from the city's Maywood lockup to the criminal courts building in downtown Chicago. During the half hour drive in a squad car, Layer told the defendant that the extradition involved a homicide charge and in response the defendant said he should not be charged with homicide but rather manslaughter. The defendant wanted to make a phone call and give a statement to Layer.

After Layer advised him of his rights and the defendant said he had already given two statements and a third "wouldn't be a big deal," the defendant told Layer (1) he had lost his job and was afraid to tell his wife about it; (2) he had been wandering around town for two weeks looking for a job; (3) he met a man and talked to him a while before the man had him follow him home to fill out a job application; (4) after 5-10 minutes, the man had not come back with an application, so the defendant took it upon himself to go into the room where the man had gone; (5) he found the man on a bed in the room playing with himself and then strangled the man to death before he left with the man's vehicle and credit cards; and (6) he then came to Chicago's west side to buy drugs and where he met two people.

In DNA testing done at the State Police crime lab in Grand Rapids, forensic analyst Joel Schultze examined fingernail clippings, the ligature, and tennis shoes as well as rectal, oral, penis, and other swabs, including swabs of matter from his left thigh and rectal smears from Sullivan. He also tested buccal swabs and blood vials taken from the defendant. Schultze did not find seminal stains or semen on the rectal

11

and oral swabs.  He found sperm cells on the penis swabs and the swabs of matter found on Sullivan's left thigh.  There were no sperm cells on the rectal and oral smears.

On the penal swab's nonsperm fraction, Schultze said it was a mixture from Sullivan and [an] additional donor at 2 of the 13 DNA locations (loci) from which he drew no conclusions.  The sample drawn from under Sullivan's right hand fingernails showed a mixture of Sullivan's DNA and that of an additional donor, which was a match with the defendant's DNA at 12 of the possible 13 locations.  Only Sullivan's DNA was in the left thigh semen sample.  Testing of the left hand fingernail showed Sullivan's and the defendant's DNA, the latter at all 13 locations.  There were no DNA results from the ligature and two extracts from the shoestring(s).

A bus driver for ATV Van Com (MAX) in the city of Holland, Christine Panuco was working on August 13, 2004, from 6:35 a.m. to 1:30 p.m. when the defendant sometime that morning got on the bus at 24th and Lincoln streets and got off in the vicinity of a Shell gas station and an outlet mall on the north side of Holland.  During the ride, the defendant and Panuco talked, and the driver watched him get off the bus alone.  She did not remember him riding the bus other than that day.

The manager of the Shell gas station, Sara Van Slooten, said she remembered the defendant had walked into the store between 9 a.m. and 10 a.m. on the morning of August 13, 2004, and bought a pack of cigarettes.  She said she had recognized him and confirmed he was alone, spent 5-10 minutes in the store, and then walked out.  She did not see him get into a car.

Hamilton, who is 50 years old and homeless, was brought to court from Illinois, where he had been incarcerated on charge(s) pending there.  He served a sentence on a credit card possession conviction arising out of the August 13, 2004, Kohl's Department Store incident.  Hamilton said he is a drug addict and Kulifajova is an addict and a prostitute.

On August 13, 2004, the defendant picked Hamilton up in the Aztek outside Marvin's Soul Food Restaurant in the area of Fifth Avenue and Cicero in Chicago in the brickyard area where homeless people stay.  The defendant then bought three bags of heroin which they used on [a] nearby railroad track enbankment.  The defendant had needles and equipment they used to inject the heroin.  He had a wallet and several credit [card]s he told Hamilton they had to use to get money before 4:30 p.m. by which time they would be reported stolen.

The two agreed to a credit card fraud scheme to get money and split it with Kulifajova's help.  On the way to the Kohl's store after Kulifajova returned from her "date," she urged Hamilton not to take part in the scheme.  The defendant showed Hamilton some of the stolen valuables, said they were from Michigan and could not be traced, and asked Hamilton where they could get rid of them.  Hamilton suggested they go to a pawn shop.

When the police pulled the three over after they left the Kohl's store, the defendant told them Hamilton and Kulifajova were from Michigan, but he corrected him, stating: "That's not true.  I've never been to Michigan in my life."  He said the

needles found in the truck did not belong to him or Kulifajova and said they had to belong to the defendant. He said he did not have anything to do with Sullivan's murder.

An 18-year-old woman who lives with her parents in the West Olive, Michigan, area and who knows the defendant through his son, Michael Jr., Michelle Jo Ann Ondersma said she went three times with the defendant to Chicago. He drove her Dodge Neon to the city in the beginning of August 2004 so he could get about $1,600, and he promised to pay her $100 to go with him there in her car. They went near a train station and a gas station where he phoned someone before they waited for the person to show up. The defendant was upset when the person he called did not show up.

Then, the two stopped at a place where the defendant got some synthetic heroin and had $80. They went from there back to the gas station where they had stopped earlier and where she and defendant both snorted the "dalata." It was the first time she had taken the drug.

The next day, the defendant drove Ondersma and a man named Nick in Nick's truck to Chicago to buy more dalata and cigarettes in Indiana. The defendant promised her $100 for taking him to Chicago with them, but never gave her the money. They went to what Ondersma agreed was a "ghetto area" in Chicago where they all "did" synthetic heroin and where Nick got woozy and vomited. Ondersma dropped the defendant off at a corner and waited for him to come back.

She gave him money to buy the drugs. She also paid for the carton of cigarettes she bought at an Indiana gas station. In the car, Ondersma had a purse between her legs that had $187 in it that turned up missing when she helped Nick out of the truck to vomit. Due to the effect(s) of the dalata she had taken, Ondersma was not thinking clearly at the time and did not think anything would happen to her purse when she got out of the truck.

The next day, Ondersma went with the defendant and a Hispanic couple to Chicago to get more dalatas. The couple went to buy cocaine with their own money. They went in the couple's car, and Ondersma said she paid for the heroin for her and the defendant. The defendant bought the dalatas for him and Ondersma, while the couple was able to buy the cocaine they wanted.

Ondersma did not feel well at all from the dalata(s) she had taken and walked to a church where she sat and called Nick on the defendant's cell phone to check on him. The four returned to Holland, Michigan, around 5 p.m. Asking him about her wallet, Ondersma said the defendant told her a woman in Chicago picked it up and he would try to get it back for her. He never did. Later, investigators told her it had been taken from her.

Trial counsel had marked into evidence photograph(s) Thompson took of the crime scene showing the damage to the fan into which Sullivan's head had been thrown. After the defendant in court acknowledged his right to testify and after having waived that right, the defense rested without calling any witnesses and without presenting any other evidence.

13

Def.-Appellant's Br. on Appeal, in *People v. Brancaccio*, No. 263321 (Mich. Ct. App.), at 1-20 (citations to trial transcript omitted).

C.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court

to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the

15

decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.    *Sufficiency of the Evidence (State Court Brief Claim)*

In the state court briefs which petitioner has attached to his habeas application, petitioner argued that the prosecution presented insufficient evidence to prove his guilt on the murder charges. To the extent petitioner raises this claim here, it is without merit.

1.    *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993). However, under the amended version of § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of

16

the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

Under Michigan law, the common law crime of murder is defined as second degree murder, and is punishable by up to life imprisonment. *See* MICH. COMP. LAWS § 750.317. To establish second degree murder, the prosecution must show that the defendant killed a human being with malice aforethought. In order to show malice aforethought, the prosecution must establish one of three mental states on the part of the defendant at the time of the killing: (1) intent to kill; (2) intent to commit great bodily harm; or (3) intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result. *See People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d 304, 319-20 (1980). Certain additional elements elevate second degree murder to first degree murder, which is punishable by a mandatory term of nonparoleable life imprisonment. Specifically, under Michigan law, first degree murder includes any "[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing," MICH. COMP.

17

LAWS § 750.316(1), as well as "[m]urder committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, or kidnapping." MICH. COMP. LAWS § 750.316(1)(b). Under either theory of first degree murder, the prosecution must show that a defendant had the mental state necessary for murder, that is, malice aforethought. *See generally*, *People v. Aaron*, 409 Mich. 672, 713-21, 299 N.W.2d 304, 319-323 (1980); *People v. Turner*, 213 Mich. App. 558, 556, 540 N.W.2d 728, 732-33 (1995) (per curiam). Under Michigan law, malice is established by showing that the defendant possessed one of three mental states: (1) intent to kill; (2) intent to do serious bodily harm; or (3) wanton and willful disregard for the likelihood that the natural tendency of his act is to cause death or great bodily harm. *See Aaron*, 409 Mich. at 733, 299 N.W.2d at 328. Thus, with respect to first-degree premeditated murder, "the prosecution must prove that the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate." *People v. Anderson*, 209 Mich. App. 527, 537, 531 N.W.2d 780, 786 (1995); *see also*, *Grant v. Rivers*, 920 F. Supp. 769, 786 (E.D. Mich. 1996); *People v. Younger*, 380 Mich. 678, 681, 158 N.W.2d 493, 495 (1968); *People v. Brown*, 137 Mich. App. 396, 407, 358 N.W.2d 592, 597 (1984). With respect to first degree felony murder, the elements are "(1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result; (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in M.C.L. § 750.316." *Turner*, 213 Mich. App. at 566, 540 N.W.2d at 732.

18

2.    *Analysis*

Petitioner was convicted of first degree murder under both a premeditation theory and a felony murder theory.   Petitioner argues in his state court brief that the prosecution presented insufficient evidence to prove his guilt of first degree murder beyond a reasonable doubt under both a premeditation and felony murder theory.   The Court should reject this claim.[2]

*a.  Premeditated Murder*

In his state court brief, petitioner argued that the evidence was insufficient to prove premeditated murder because the evidence showed that he met the victim at the gas station by chance, and there was no evidence that "he intended to meet the victim anywhere to establish he laid a plan to commit murder of any degree."   This argument misapprehends the premeditation requirement.   Premeditation does not require planning and preparation.   Rather, as the Michigan Court of Appeals explained, "[p]remeditation occurs where there was sufficient time between the homicidal intent and the action to afford a reasonable person time to take a second look." *Brancaccio*, 2007 WL 189332, at *4, slip op. at 4 (citing *People v. Gonzalez*, 468 Mich. 636, 641, 664 N.W.2d 159, 163(2003)); *see also*, *Brown*, 137 Mich. App. at 407, 358 N.W.2d at 597.   The minimum time required for premeditation is "incapable of exact determination," and may be merely seconds or minutes or hours, depending on the totality of the circumstances surrounding the killing.  *Marsack v. Howes*, 300 F. Supp. 2d 483, 490-91 (E.D. Mich. 2004) (Lawson, J.).

---

[2]Although I consider below the sufficiency of the evidence with respect to both theories, it is important to note that because premeditation and felony murder are simply alternative means of committing the single crime of first degree murder, "[p]etitioner's conviction is sustainable if either theory, premeditated murder or felony-murder is sustainable." *Huffman-King v. McKee*, No. 1:07-cv-19, 2010 WL 748208, at *3 (W.D. Mich. Mar. 2, 2010) (citing *People v. Biglow*, 229 Mich. App. 218, 581 N.W.2d 744, 746 (Mich.Ct.App.1998) (holding that the two theories of premeditated murder and felony-murder should simply be merged into one conviction of first-degree murder)).

19

The Michigan Court of Appeals rejected petitioner's claim, reasoning that

> [t]he evidence showed that the victim was strangled both manually and by a ligature. Both methods would have taken between three and four minutes to cause death. Additionally, the evidence showed that the ligature was repositioned at least once. It was reasonable for the jury to find that this was a sufficient length of time to afford defendant a chance to reconsider his actions. By convicting defendant of first-degree murder and not voluntary manslaughter, it rejected defendant's contention that he was so enraged that he did not have sufficient time to cool down before his actions resulted in the victim's death.

*Brancaccio*, 2007 WL 189332, at *4, slip op. at 4. This determination was reasonable.

It is well established that both intent to kill and "premeditation and deliberation may be inferred from the circumstances surrounding the killing." *People v. Ortiz-Kehoe*, 237 Mich. App. 508, 520, 603 N.W.2d 809 (1999); *accord Warren v. Smith*, 161 F.3d 358, 361 (6th Cir. 1998); *People v. McRunels*, 237 Mich. App. 168, 181, 603 N.W.2d 95, 102 (1999); *Anderson*, 209 Mich. App. at 537, 531 N.W.2d at 786. Relevant factors include the relationship of the parties, the defendant's actions prior to the killing, the circumstances of the killing, and the defendant's conduct after the killing. *See id.*; *Brown*, 137 Mich. App. at 407, 358 N.W.2d at 597. Here, the manner in which the murder was committed–manual and ligature strangulation with at least one repositioning of the ligature–provides strong circumstantial evidence that petitioner both intended and premeditated the killing of the victim. *See Gonzalez*, 468 Mich. at 641, 664 N.W.2d at 163 ("Manual strangulation can be used as evidence that a defendant had an opportunity to take a 'second look.'"); *People v. Johnson*, 460 Mich. 720, 733, 597 N.W.2d 73, 79 (1999) (same). In addition, there was evidence that the victim was tied up, as well as petitioner's own statements in which he indicated that he partially cleaned up the scene (throwing a comforter into a jacuzzi) and the fact that he immediately fled to Chicago. From all of these circumstances, a rational jury could have concluded beyond a reasonable doubt that petitioner acted with premeditation and deliberation.

And it certainly cannot be said that the Michigan Court of Appeals's determination that a rational jury could have done so was unreasonable, as required for habeas relief to be granted under § 2254(d)(1).

This conclusion is not altered by petitioner's argument that the evidence showed that he acted in the heat of passion and was therefore guilty, at most, of voluntary manslaughter. While there was some evidence to support such a theory–mostly petitioner's own statements to the police–it does not follow that the evidence of premeditation was insufficient. That the evidence might equally support contrary inferences is irrelevant; the prosecution's evidence need not rule out every hypothesis other than petitioner's guilt to be sufficient. *See Jackson*, 443 U.S. at 326. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his sufficiency of the evidence claim.

### b. Felony Murder

Likewise, the Court should conclude that the prosecution presented sufficient evidence to sustain his first degree murder conviction on a felony murder theory. Petitioner argues that the evidence established that he went to the victim's home for a job, not to rob him, and that his larceny occurred solely as an afterthought. As petitioner rightly notes and as the court of appeals observed in this case, it is well established that the felony murder statute requires "that the defendant intended to commit the underlying felony at the time the homicide occurred." *People v. Brannon*, 194 Mich. App. 121, 125, 486 N.W.2d 83, 85-86 (1992); *see also*, *People v. Kelly*, 231 Mich. App. 627, 643, 588 N.W.2d 480, 488-89 (1998); *Brancaccio*, 2007 WL 189332, at *4, slip op. at 5. Thus, "the felony-murder doctrine will not apply if the intent to steal property of the victim was not formed until after the homicide." *Brannon*, 194 Mich. App. at 125, 486 N.W.2d at 86. "'Because the intent

21

to commit the enumerated felony of larceny was an element of the crime of felony murder, the prosecution had to produce some evidence with regard to this element or evidence from which this element could be inferred.'" *Stribling v. Smith*, No. 97-CV-71848, 2000 WL 796181, at *19 (E.D. Mich. May 31, 2000) (Friedman, J., adopting report and recommendation of Komives, M.J.) (quoting *Brannon*, 194 Mich. App. at 125, 486 N.W.2d at 85).

Applying this rule, the Michigan Court of Appeals rejected petitioner's claim, concluding that sufficient evidence of petitioner's intent to steal from the victim at the time of the murder was presented. Notably, the court explained, in petitioner's "third confession, he stated that he and an accomplice intended to rob the victim's house before the accomplice entered it." *Brancaccio*, 2007 WL 189332, at *4, slip op. at 5. This determination was reasonable. Detective Blakely testified at trial that in one of the confessions, a video of which was played for the jury, petitioner admitted that it was a "rip"–*i.e.* a theft–"from the very beginning." *See* Trial Tr., Vol. 3, at 470; *see also*, *id*. at 471-72, 477. While it is true that this statement by petitioner conflicted with his other statements, and that it could not have been completely true–there was never any accomplice–the jury could have still accepted the portion of the statement that petitioner intended to steal from the victim from the very beginning of his encounter with the victim. As the Michigan Court of Appeals explained, the jury was "allowed to accept all, part, or none of the presented evidence," and the jury reasonably could have concluded "that what actually occurred was a mixture of defendant's accounts." *Brancaccio*, 2007 WL 189332, at *4, slip op. at 5. A reviewing court, whether on direct appeal or habeas review, "do[es] not make credibility determinations in evaluating the sufficiency of the evidence." *United States v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000); *Walker v. Russell*, 57 F.2d 472, 475-76 (6th Cir. 1995); *see also*, *United States v. Bailey*, 444 U.S. 394, 414-15 (1980) ("It is

for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story.").  "The fact that the testimony is contradictory does not mean that evidence is insufficient, only that the jury must make credibility determinations." *Government of the Virgin Islands v. Isaac*, 50 F.3d 1175, 1179 (3d Cir. 1995).  It is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson*, 443 U.S. at 326; *United States v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996).  Accordingly, the Court should conclude that the evidence was sufficient to sustain petitioner's first degree murder conviction on a felony murder theory.

E.     *Denial of Psychological Expert/Right to Present a Defense (Claim I)*

Petitioner next contends that he was denied his right to present a defense of insanity or temporary insanity based on his heroin addiction and his acting under the influence of heroin at the time of the crime.  He also contends that the trial court abused its discretion in denying his counsel's request for funds for an independent psychological evaluation.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.     *Clearly Established Law*

Petitioner's psychological expert/insanity claim actually raises two distinct claims.  First, petitioner's claim implicates the rule of *Ake v. Oklahoma*, 470 U.S. 68 (1985).  In that case, the Supreme Court held that when an indigent defendant demonstrates to a trial judge that his or her sanity at the time of the commission of the offense is to be a significant factor at trial, the state must assure a criminal defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in the evaluation, preparation, and presentation of the defense. *See id.* at 83.

"To establish an *Ake* violation, the defendant must show a reasonable probability that an expert would aid his defense, and that denial of expert assistance would result in an unfair trial." *United States v. Rodriguez*, 581 F.3d 775, 789 (8th Cir. 2009) (internal quotation omitted). He must also show that he made a timely request to the trial court for expert assistance, and that the request was improperly denied. *See McKinley v. Smith*, 838 F.2d 1524, 1528 (11th Cir. 1988). In determining whether a defendant's due process rights were violated by the defendant's failure to receive competent psychiatric assistance, a court must examine the information before the trial court and determine whether that information should have lead the trial court to conclude that the defendant would not receive a fair trial. *See Clisby v. Jones*, 960 F.2d 925, 930 (11th Cir. 1992); *Parker v. Turpin*, 60 F. Supp. 2d 1332, 1375 (N.D. Ga. 1999). Petitioner bears the burden of making a particularized showing that such expert psychiatric assistance is necessary. The state is not required to provide expert psychiatric assistance where the defendant offers only undeveloped assertions that the required assistance would be beneficial. *See Mason v. Mitchell*, 95 F. Supp. 2d 744, 774 (N.D. Ohio 2000) (citing *Caldwell v. Mississippi*, 472 U.S. 320, 323 n. 1 (1985)).

Petitioner's claim also raises a more generalized claim that he was denied his right to present a defense. Although the Constitution does not explicitly provide a criminal defendant with the right to "present a defense," the Sixth Amendment provides a defendant with the right to process to obtain witnesses in his favor and to confront the witnesses against him, and the Fourteenth Amendment guarantees a defendant due process of law. Implicit in these provisions is the right to present a meaningful defense. As the Supreme Court has recognized, "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967). "The right to compel a witness' presence

24

in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact. The right to offer testimony is thus grounded in the Sixth Amendment." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988). Further, the Court has noted that "[t]his right is a fundamental element of due process of law," *Washington*, 388 U.S. at 19, and that "[f]ew rights are more fundamental[.]" *Taylor*, 484 U.S. at 408. Although the right to present a defense is fundamental, it is not absolute. Thus, the right must yield to other constitutional rights, *see e.g.*, *United States v. Trejo-Zambrano*, 582 F.2d 460, 464 (9th Cir. 1978) ("The Sixth Amendment right of an accused to compulsory process to secure attendance of a witness does not include the right to compel the witness to waive his Fifth Amendment privilege."), or to other legitimate demands of the criminal justice system, *see United States v. Scheffer*, 523 U.S. 303, 308 (1998).

To constitute a denial of the right to present a defense, a trial court's exclusion of evidence must "infringe[] upon a weighty interest of the accused." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). A "weighty interest of the accused" is infringed where "the exclusion of evidence seriously undermined 'fundamental elements of the defendant's defense' against the crime charged." *Miskel v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005) (quoting *Scheffer*, 523 U.S. at 315). Thus, "'[w]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (quoting *Washington v. Schriver*, 255 F.3d 45, 47 (2d Cir. 2001)) (alterations by quoting court). In other words, application of the rules of evidence constitute a denial of the right to present a defense only where it "significantly undermine[s] fundamental elements of the accused's defense,"

25

*Scheffer*, 523 U.S. at 315–that is, where the application of the evidentiary rules "infringe[s] upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308.

    2.    *Analysis*

Turning first to the *Ake* claim, petitioner has failed to establish that he was denied a fair trial for a number of reasons. First, it is not clear that petitioner ever made a proper request for the appointment of an independent psychological expert. The state court record does not reveal the filing of a motion for the appointment of an expert or for funds with which to retain an expert. The only evidence of a request is a letter from counsel to the trial judge, dated November 19, 2004, in which counsel informs the court that some testimony at a motion hearing led him to believe that it would be "necessary for the defense for me to at least consult a psychologist about some of the behavior." Counsel therefore asked for "authorization to spend a modest amount in consulting with a psychologist to see if there is any merit in my theory." Counsel indicated, however, that "[b]efore we would proceed beyond that, I would make a formal request." Pet., App. IV. It does not appear that the court ever acted on this request.

This request, however, does not trigger *Ake*. Under Michigan law, a defendant seeking to raise a defense of insanity must first file a notice of intent to do so. *See* MICH. COMP. LAWS § 768.20a(1). Once he does so, the court then orders the defendant to undergo an examination at the Center for Forensic Psychiatry. *See id.* § 768.20a(2). Only after a notice of intent has been filed may a defendant request to undergo an independent psychiatric examination or, if indigent, request appoint of or funds to obtain such an independent psychiatric expert. *See id.* § 768.20a(3). In short, "[a]n incarcerated defendant has no right to an independent evaluation under MCL 768.20a until a

26

notice of intent has been filed, and then only after the defendant is first examined at the forensic center." *People v. Shahideh*, 482 Mich. 1156, 758 N.W.2d 536, 538 (2008) (Taylor, C.J., concurring). Further, "[u]nder *Ake*, the defendant must make the threshold showing that his mental health will be a 'significant factor' in his defense in order to be entitled to a psychiatric expert. General allegations, without substantive supporting facts, are insufficient to require the appointment of a psychiatrist." *Smith v. Workman*, 550 F.3d 1258, 1268 n.5 (10th Cir. 2008) (quoting *Ake*, 470 U.S. at 82-83) (citations omitted). In other words, "the burden for securing an *Ake* expert is on the defendant." *Id.* at 1269. Here, counsel's informal, generalized assertion that he needed to consult with a psychologist about some of the defendant's behavior does not provide any supporting facts establishing that petitioner's mental health would be a significant factor at trial.

Second, even assuming that a proper request for an expert had been made, petitioner cannot show that he was entitled to an expert. Petitioner contends that an expert was necessary to establish a defense of involuntary intoxication. However, there is nothing in the record to establish that petitioner consumed heroin or any other substances involuntarily, rather than voluntarily. And "[u]nder Michigan law an individual who is voluntarily intoxicated does not have grounds for an absolute defense based upon his insanity." *Hoss v. Jackson*, No. 99-CV-73582-DT, 2000 WL 1137731, at *14 (E.D. Mich. July 13, 2000) (Zatkoff, J.) (citing *People v. Caulley*, 197 Mich. App. 177, 187, 494 N.W.2d 853, 858 (1993)); *see* MICH. COMP. LAWS § 768.29a(2) ("An individual who was under the influence of voluntarily consumed or injected alcohol or controlled substances at the time of his or her alleged offense is not considered to have been legally insane solely because of being under the influence of the alcohol or controlled substances."). While voluntary intoxication may be so severe that it negates the specific intent element of a specific intent crime–where the

27

defendant is "intoxicated to the point at which he was incapable of forming the intent to commit the charged crime," *People v. Mills*, 450 Mich. 61, 82, 537 N.W.2d 909, 920 (1995); *People v. Savoie*, 419 Mich. 118, 133-34, 349 N.W.2d 139, 146 (1984); *People v. King*, 210 Mich. App. 424, 428, 534 N.W.2d 535, 536 (1995)–such a defense is not one of legal insanity governed by *Ake*. *See, e.g.*, *Kordenbrock v. Scroggy,* 919 F.2d 1091, 1120 (6th Cir. 1990) (en banc) (opinion of Kennedy, J., with five Judges concurring and one Judge concurring in result) (indigent defendant who raises a diminished capacity defense in a state court prosecution is not entitled to a state-funded psychiatrist to assist him at trial, because such a defense does not raise a question as to the defendant's sanity).

There is one exception to the general rule that voluntary intoxication cannot support an insanity defense: where "the voluntary continued use of mind-altering substances results in a settled condition of insanity before, during, and after the alleged offense." *Hoss*, 2000 WL 1137731, at *14 (citing *Caulley*, 197 Mich. App. at 187, 494 N.W.2d at 858). To the extent petitioner is asserting insanity on this basis, however, any error in the failure to appoint an expert was harmless. A state trial court's denial of a court-appointed independent expert psychiatrist to assist an indigent defendant as guaranteed under *Ake* is subject to harmless error review. *See Powell v. Collins,* 332 F.3d 376, 393 (6th Cir. 2003); *White v. Johnson*, 153 F.3d 197, 201 (5th Cir. 1998). Under Michigan law, "[a]n individual is legally insane if he proves, as a result of mental illness as defined in the mental health code, that he lacked the substantial capacity to appreciate the nature and quality or the wrongfulness of his conduct or lacked the ability to conform his conduct to the requirements of the law." *Lautner v. Berghuis*, 694 F. Supp. 2d 698, 722 (W.D. Mich. 2010) (citing *People v. Carpenter*, 464 Mich. 223, 231, 627 N.W.2d 276, 280 (2001); MICH. COMP. LAWS § 768.21a(1)). Here, petitioner has presented no evidence, and the state court record contains none, showing that

28

he lacked the substantial capacity to appreciate the nature, quality, and wrongfulness of his conduct, or lacked the ability to conform his conduct to the requirements of the law, or that he was so intoxicated that he could not have formed the requisite intent.  On the contrary, petitioner's behavior during and after the crime negate a conclusion that he was so intoxicated as to be unable to form the specific intent necessary to commit the crime or that he was legally insane at the time of the crime. For example, petitioner was able to recall to the police the events–or at least his version of the events–surrounding the murder.  *See Wiley v. Wainwright*, 793 F.2d 1190, 1194 (11th Cir. 1986); *McNair v. Campbell*, 307 F. Supp. 2d 1277, 1330-31 (M.D. Ala. 2004); *United States ex rel. Gill v. Gramley*, 16 F. Supp. 2d 924, 934 (N.D. Ill. 1998).  Petitioner was able to partially clean the crime scene and flee the scene.  *See Reid v. True*, 349 F.3d 788, 800 (4th Cir. 2003); *Gill*, 16 F. Supp. 2d at 934.  Further, petitioner was able to engage in complex, goal-oriented behavior such as searching for the victim's valuables and driving away in his automobile.  *See Reid*, 349 F.3d at 800.  And, most importantly, petitioner himself indicated that he understood the wrongfulness of his actions in the phone call with his wife.  In these circumstances, petitioner cannot show that he was prejudiced by the trial court's failure to appoint a psychiatric expert.

For the same reasons, petitioner cannot show that he was denied his more general right to present a defense.  As explained above, to show that he was denied his right to present a defense petitioner must show that the trial court's decision "infringe[d] upon a weighty interest of the accused," *Scheffer*, 523 U.S. at 308, by showing that the "'omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *Blackwell*, 459 F.3d at 753 (quoting *Washington*, 255 F.3d at 47) (alterations by quoting court).  As explained above, however, petitioner had no viable defense based on his intoxication or heroin addiction.

Thus, petitioner cannot show that the appointment of a psychiatric expert would have produced evidence which, in conjunction with the other evidence introduced at trial, would have created a reasonable doubt respecting petitioner's guilt.   Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Coerced Confession/<u>Miranda</u> (Claim III)*

Petitioner next contends that his various confessions were coerced or taken in violation of his right to counsel under *Miranda*.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

As the Supreme Court explained in *Jackson v. Denno*, 378 U.S. 368 (1964), "a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession."  *Jackson*, 378 U.S. at 376.  "Determining whether a confession is 'voluntary' for due process purposes entails an examination into the 'totality of the circumstances' to determine whether the confession was procured by acceptable techniques that draw upon an essentially free and unconstrained choice or by unacceptable tactics that extract their results from an overborne will.  The critical line of distinction is between 'self-direction' and 'compulsion.'" *Cooper v. Scroggy*, 845 F.2d 1385, 1390 (6th Cir. 1988) (citing *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)); *accord Dickerson v. United States*, 530 U.S. 428, 434 (2000).  It is not enough that a defendant's will was "overborne" by some factor for which state officials are not responsible.  "Coercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary, and the defendant must establish

a causal link between the coercive conduct and the confession." *Carter v. Johnson*, 131 F.3d 452, 462 (5th Cir. 1997) (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). There is no bright line test for determining whether a confession is voluntary, nor is any one factor dispositive. Rather, a court must "look[] to the totality of the circumstances concerning whether a defendant's will was overborne in a particular case. Relevant factors may include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishments, such as the deprivation of food or sleep." *United States v. Mahan*, 190 F.3d 416, 422-23 (6th Cir. 1999) (internal quotation and citation omitted); *accord*, *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997); *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994).

For purposes of habeas review, "the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a [legal] matter for independent federal determination." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). However, a state court's findings of historical fact are presumed by this Court to be correct unless rebutted by petitioner with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). *See generally*, *Townsend v. Sain*, 372 U.S. 293, 309 n.6 (1963) (factual findings entitled to a presumption of correctness under the habeas statutes are those relating to "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators.") (internal quotation omitted). Thus, "subsidiary factual questions, such as whether . . . in fact the police engaged in the intimidation tactics alleged by the defendant are entitled to the § 2254[(e)(1)] presumption." *Miller*, 474 U.S. at 112; *see also*, *id*. at 117.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court considered the applicability

31

of the Fifth Amendment's Self-Incrimination Clause to custodial interrogations by the police. The Court ruled that, in some circumstances, statements made while in custody can violate the Self-Incrimination Clause even if the statement was otherwise "voluntary" under the Due Process Clause. As the Court has more recently explained, the *Miranda* decision

> concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be "accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself." [*Miranda*, 384 U.S.] at 439. Accordingly, we laid down "concrete guidelines for law enforcement agencies and courts to follow." *Id.*, at 442. Those guidelines established that the admissibility in evidence of any statement given during custodial interrogation of a suspect would depend on whether the police provided the suspect with four warnings. These warnings (which have come to be known colloquially as "Miranda rights") are: a suspect "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to questioning if he so desires." *Id.*, at 479.

*Dickerson v. United States*, 530 U.S. 428, 435 (2000) (parallel citations omitted). The *Miranda* Court explained that if the suspect indicates that he wishes to remain silent, "the interrogation must cease." *Miranda*, 384 U.S. at 474. Similarly, if the suspect requests counsel "the interrogation must cease until an attorney is present." *Id.*; *see also*, *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Although it has been characterized otherwise at times, the rule of *Miranda* is of federal constitutional dimension. *See Dickerson*, 530 U.S. at 438-40. Thus, claims based on the right to counsel at questioning recognized in *Miranda* are cognizable on habeas review. *See id.* at 439 n.3; *Thompson v. Keohane*, 516 U.S. 99, 107 n.5 (1995).

In determining the validity of the police interrogation, the ultimate issues of whether petitioner waived his rights to remain silent and to counsel are legal determinations to be reviewed under § 2254(d)(1). *See, e.g.*, *Thompson*, 516 U.S. at 112-13 (determination of whether

interrogation was a "custodial interrogation" under *Miranda* is a legal determination not subject to the presumption of correctness for state court findings of historical fact); *Brewer v. Williams*, 430 U.S. 387, 397 n.4 (1977) (same as applied to question of whether petitioner validly waived his Sixth Amendment right to counsel). However, as with the voluntariness issue, the state courts' resolution of the underlying historical facts are presumed correct unless rebutted by clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1).

2.      *Analysis*

Petitioner contends that his statements to the police were taken in violation of his *Miranda* right to counsel and were involuntary. Prior to trial, the court held a hearing on petitioner's motion to suppress his statements, at which four of the officers involved in his various statements testified. The testimony of the officers was accurately summarized in the prosecutor's brief in the Michigan Court of Appeals:

> Detective Raha testified he interviewed defendant at the North Riverton [sic] Police Department in North Riverside, Illinois on August 14, 2004. Prior to his interview, defendant was advised of his constitutional rights and signed the waiver form. Defendant never requested an attorney nor did he appear to be intoxicated because of the use of controlled substances.
> Detective Blakely of the Ottawa County Sheriff's Department was present when Detective Raha interviewed defendant. The detectives conducted the interview telling defendant they did not believe he was being truthful. Later that evening, Blakely received a message defendant wanted to speak to him. Defendant indicated he wanted to talk to his wife and desired an attorney. Blakely ceased asking defendant questions. Blakely left under the impression defendant wanted to talk to the detectives but not at that moment.
> Brian Leary, Special Agent with the U.S. Secret Service also spoke with defendant on August 14, 2004 with Detective Raha. Later that evening Leary was speaking to defendant, alone. At no time did defendant request an attorney, at one time defendant told Leary he wanted to speak to Detective Blakely. There came a time defendant requested an attorney, but still told the detectives he wanted to talk to them, just not at that time.
> Detective Frank Schmalz of the North Riverside Police Department testified he arrived at the station about 8:00 a.m. on Sunday, August 15. His department was

33

investigating possible credit card charges.  Schmalz was aware that defendant had earlier requested an attorney.  He went to defendant's cell to obtain some palm-fingerprints from defendant.  Defendant was in an agitated state.  Schmalz was able to calm defendant down.  Defendant then told Schmalz that Michigan authorities were going to charge him with murder and that he wanted to talk to him.  Schmalz reminded defendant he had earlier requested an attorney.  Defendant said "Fuck the attorney.  I want to talk to him [Blakely]."

Blakely then came to the cell and told defendant he had earlier asked for an attorney.  Defendant then again said "Fuck the attorney.  I want to talk to you guys." Defendant told them he would give them what they wanted.  He was again advised he had requested an attorney and would have to sign a waiver form.  Schmalz then went and prepared a waiver form agreeing to speak with detectives [and] revoking his request for an attorney.  He was again advised of his *Miranda* rights.  Defendant then made an oral statement.  Defendant was then requested to make a written statement.  Instead, defendant wished to make a video statement.  A form was prepared which defendant signed indicating defendant was voluntarily participating in this video confession.

On August 20, defendant was being transported back to Michigan.  At that time defendant was again advised of his *Miranda* rights and again signed the waiver form.

Pl.-Appellee's Br. on Appeal, in *People v. Brancaccio*, No. 263321 (Mich. Ct. App.), at 5-6.  The trial court denied the motion to suppress.

On appeal, the Michigan Court of Appeals rejected petitioner's claims that both his *Miranda* waiver and statement itself were involuntary.[3]  The court concluded that petitioner's claim that his *Miranda* waiver was involuntary because of the "inherently coercive atmosphere" of the interrogations was without merit.  The court explained that petitioner "points to no specific actions by the police that were coercive," and concluded that "[t]he alleged 'inherent' coercive atmosphere is insufficient to find that [petitioner's] waiver was not voluntary." *Brancaccio*, 2007 WL 189332, at *2, slip op. at 2.  The court also rejected petitioner's claim that his statement was not voluntary

---

[3]With respect to the voluntariness of the statement itself, the court of appeals reviewed the claim for plain error because petitioner's motion in the trial court was based solely on the *Miranda* claim.  *See Brancaccio*, 2007 WL 189332, at *2, slip op. at 2.  As respondent correctly notes, this constitutes a procedural default of the voluntariness claim.  However, because as explained below the claim is without merit, the Court may deny the claim on this basis without addressing the procedural default issue.

34

because he was under the influence of heroin at the time he gave the statement. The court reasoned:

> The evidence showed that defendant ingested heroin approximately sixteen hours before he signed the first waiver. One of the interviewing officers testified that defendant did not appear to be under the influence of any controlled substance at that time and that he had slept the night before. Defendant was an admitted habitual user of heroin and there was testimony at trial that the effects on such a person would last four to eight hours. Defendant argues that evidence of his emotional outburst in his jail cell shows that he was still under the influence of the drug. However, this incident occurred at least thirty hours after defendant last ingested heroin. The record does not support defendant's contention that this isolated, two-minute incident was sufficiently related to defendant's heroin usage.

*Id.*, slip op. at 2-3. The Court should conclude that these determinations were reasonable.

With respect to the *Miranda* issue, the evidence adduced at the suppression hearing established that petitioner initially waived his right to counsel. Although petitioner later invoked his right to counsel, he later twice indicated that he wished to speak with officers. A suspect's invocation of the right to counsel requires the police to cease questioning until either the suspect is provided counsel or the suspect "himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 485 (1981). There was no evidence from the officers indicating that petitioner's desire to waive his invocation of the right to counsel was the result of any police statements designed to elicit such a waiver. *Cf. Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (impermissible interrogation occurs where police engage in conversation or actions "reasonably likely to elicit an incriminating response from the suspect."). On the contrary, the testimony of the officers establishes that they "scrupulously honor[ed]," *Michigan v. Mosely*, 423 U.S. 96, 104 (1975), petitioner's invocation of his right to counsel until he indicated a further desire to speak with them without counsel. Thus, petitioner cannot show that he was denied his *Miranda* right to counsel. *See United States v. Valdez*, 146 F.3d 547, 551 (8th Cir. 1998). Nor can petitioner show that he was denied his *Miranda* right to counsel by the fact that the

35

police never provided him an attorney after his initial request for one. *Miranda* and *Edwards* require only that the police cease questioning a suspect once he has invoked his right to counsel. Neither case requires the police to immediately provide counsel to a suspect who has invoked his right to counsel. *See Duckworth v. Eagan*, 492 U.S. 195, 204 (1989).

Turning to the voluntariness issue, petitioner has likewise failed to present any evidence to rebut the state courts' finding that petitioner's statements to the police were voluntary. Although there was evidence that petitioner had used heroin prior to his arrest, the evidence also showed that this use had occurred over sixteen hours before the first statement and that the effects of the heroin use on an habitual user such as petitioner would have worn off after 4-8 hours. Further, the officer who took petitioner's first waiver of rights and statement indicated that petitioner did not appear to be under the influence of any drugs at the time of the interview. Petitioner has pointed to no evidence, other than the fact that he had used heroin well before his statement, to call into question the testimony of the officers at the hearing. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on these claims.

G.    *Evidentiary Claims (Claims IV and V)*

Petitioner next raises two challenges to the evidence introduced at trial. First, he contends that he was denied a fair trial by the introduction of evidence of his drug addiction and participation in a credit card fraud scheme. Second, he contends that he was denied a fair trial by the introduction of DNA evidence for which a proper foundation was not established. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.    *Clearly Established Law*

Unless a violation of a state's evidentiary rule results in the denial of fundamental fairness,

36

an issue concerning the admissibility of evidence does not rise to the level of a constitutional violation. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994); *see also, Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

2.    *Analysis*

a. *Other Acts Evidence (Claim IV)*

37

Petitioner first contends that he was denied a fair trial by the introduction of other acts evidence, specifically evidence that he was a chronic heroin user and that he had engaged in a fraud scheme involving the victim's credit cards. As noted above, the issue here is not whether this evidence was properly admitted under the Michigan Rules of Evidence, but rather whether petitioner was denied a fair trial by the introduction of this evidence. This being the case, petitioner is not entitled to habeas relief even if the evidence was not properly admitted under Rule 404(b). Both the Supreme Court and the Sixth Circuit have repeatedly held that a defendant is not denied a fair trial by the admission of prior bad acts evidence which is relevant in the defendant's trial. *See Estelle*, 502 U.S. at 69-70; *Dowling v. United States*, 493 U.S. 342, 353-54 (1990); *Coleman v. Mitchell*, 268 F.3d 417, 439-40 (6th Cir. 2001); *Pennington v. Lazaroff*, 13 Fed. Appx. 228, 232 (6th Cir. 2001) (per curiam) (unpublished); *Manning v. Rose*, 507 F.2d 889, 893-95 (6th Cir. 1974). Here, the evidence of petitioner's drug use was admissible for the proper purpose of establishing his motive, *see Brancaccio*, 2007 WL 189332, at *3, slip op. at 3, and the evidence of the credit card fraud was "necessary to understand the circumstances of the case and [petitioner's] statements." *Id*. Thus, petitioner is not entitled to habeas relief on this claim.

### b. DNA Evidence (Claim V)

Petitioner also contends that he was denied a fair trial by the introduction of DNA evidence. At trial, counsel stipulated to the reliability of DNA testing. Petitioner nevertheless contends that a proper foundation was not established for the admissibility of the DNA testing. As noted above, the question is not whether the admission of this evidence was improper under the rules governing scientific evidence. Rather, the only issue for this Court on habeas review is whether the admission of the evidence denied defendant a fair trial; that is, whether the evidence was "almost totally

38

unreliable" such that "the factfinder and the adversary system w[ould] not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983). Petitioner has failed to meet this burden.

First, there is no question that the polymerase chain reaction (PCR) method of DNA testing–the type used in petitioner's case–is sufficiently reliable to be admitted. The "courts have repeatedly held that the PCR method rests on a sufficiently reliable basis to be admitted under Federal Rule of Evidence 702 or state analogues. Indeed, several courts, including the Michigan courts, have concluded that 'the reliability of the PCR method of DNA analysis is sufficiently well established to permit the courts . . . to take judicial notice of it[.]'" *Coy v. Renico*, 414 F. Supp. 2d 744, 761-62 (E.D. Mich. 2006) (Rosen, J.) (citations omitted) (quoting *United States v. Beasley*, 102 F.3d 1440, 1448 (8th Cir. 1996 and citing *United States v. Trala*, 386 F.3d 536, 541-42 (3d Cir. 2004); *United States v. Boswell*, 270 F.3d 1200, 1204-05 (8th Cir. 2001); *United States v. Shea*, 159 F.3d 37, 41 (1st Cir. 1998); *United States v. Gaines*, 979 F. Supp. 1429, 1433 n.4 (S.D. Fla. 1997) (citing decisions of over 20 state appellate courts); *People v. Coy*, 243 Mich. App. 283, 291-92, 620 N.W.2d 888, 893-94 (2000)).

Second, the Michigan Court of Appeals "has continued to reject . . . challenges to statistical analysis of DNA evidence, finding such arguments are relevant to the weight of the evidence, not its admissibility." *People v. Coy*, 258 Mich. App. 1, 11, 669 N.W.2d 831, 838-39 (2003) (per curiam) (discussing and citing *People v. Holtzer*, 255 Mich. App. 478, 491, 660 N.W.2d 405, 412 (2003); *People v. Leonard*, 224 Mich. App. 569, 591, 569 N.W.2d 663, 673 (1997); *People v. Chandler*, 211 Mich. App. 604, 611, 536 N.W.2d 799, 803 (1995)); *see also*, *Murphy v. Elo*, No. 97-CV-76017-DT, 2005 WL 2284223, at *12 (E.D. Mich. Sept. 1, 2005) (Cohn, J., adopting Report of

39

Komives, M.J.), *aff'd*, 250 Fed. Appx.703 (6th Cir. 2007). Indeed, "the courts have recognized that '[s]tatistical probabilities are basic to DNA analysis and their use has been widely researched and discussed.'" *Coy*, 414 F. Supp. 2d at 762 (quoting *United States v. Davis*, 40 F.3d 1069, 1075 (10th Cir. 1994) and citing *United States v. Chischilly*, 30 F.3d 1144, 1153 (9th Cir. 1994); *United States v. Bonds*, 12 F.3d 540, 557, 565-66 (6th Cir. 1994); *Reid v. Page*, 47 F. Supp. 2d 1008, 1012-13 (C.D. Ill. 1999); *State v. Loftus*, 573 N.W.2d 167, 174-75 (S.D. 1997)). Third, petitioner has pointed to no foundation problems with the evidence in his case. As the court of appeals explained, petitioner has pointed to "no evidence suggesting that the lab's equipment was not working properly or that proper procedures were not followed.

Moreover, the admission of the DNA evidence, even if error, was harmless. Here, the DNA evidence implicated petitioner only to the extent of placing him at the scene and struggling with the victim. These facts, however, were well established by petitioner's own statements to the police. The only issue at trial was petitioner's mental state at the time of the murder, a question not addressed by any of the DNA evidence. Thus, petitioner cannot show that he was denied a fair trial by the admission of this evidence.

H.      *Ineffective Assistance of Counsel (Claims II and IV-VI)*

Finally, petitioner contends that counsel was ineffective in a number of respects. Specifically, petitioner contends that counsel was ineffective for: (1) failing to challenge his extradition; (2) failing to challenge the other acts evidence; (3) failing to object to the DNA evidence; and (4) calling petitioner a liar, thief, and killer in closing argument. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*. at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id*. With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

41

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id*., at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*., at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

    2.    *Analysis*

    *a.  Failure to Challenge Extradition (Claim II)*

Petitioner first contends that counsel should have challenged his extradition from Illinois to Michigan pursuant to the Interstate Agreement on Detainers (IAD). Petitioner contends that his

initial waiver of extradition in Illinois was invalidated by the Cook County Circuit Court in Illinois and that he did not have counsel to challenge the extradition.  He argues, therefore, that his Michigan counsel should have challenged the extradition and sought dismissal of the charges.  Petitioner cannot show that counsel was ineffective for failing to do so, however, because any such challenge would have been meritless.

It is well established under the IAD that "[c]hallenges to extradition proceedings must be made in the asylum state. Opposition to such extradition comes too late upon submission to the jurisdiction of the charging state." *People v. Duck*, 147 Mich. App. 534, 540-41, 383 N.W.2d 245, 248 (1985).  Nor does the alleged illegality of petitioner's extradition call into question the validity of the proceedings in the Michigan courts, including his conviction and sentence.  It is an "established rule that illegal arrest or detention does not void a subsequent conviction." *Gerstein v. Pugh*, 420 U.S. 103, 119 (1975) (citing *Frisbie v. Collins*, 342 U.S. 519 (1952); *Ker v. Illinois*, 119 U.S. 436 (1886)).  In *Frisbie*, the Court applied this rule to reject a claim that the defendant's conviction was void by the fact that he was forcibly abducted from one state to another to secure his presence for trial.  The Court explained that "the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.' . . . [D]ue process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will." *Frisbie*, 342 U.S. at 522.  Under *Ker* and *Frisbie*, "the manner by which a defendant is brought to trial does not affect the government's ability to try him," *United States v. Matta-*

43

*Ballesteros*, 71 F.3d 754, 762 (9th Cir. 1995), and thus the failure of a sending state under the IAD to obtain a proper waiver or afford a pretransfer hearing does not affect the jurisdiction of the receiving state. *See Remeta v. Singletary*, 85 F.3d 513, 518 (11th Cir. 1996). Because petitioner had no right to dismissal based on the alleged violation of the IAD, either under the IAD or as a matter of due process, he cannot show that counsel was ineffective for failing to move for dismissal of the charges on this basis.

### b. Failure to Challenge Other Acts Evidence (Claim IV)

Petitioner next contends that counsel was ineffective for failing to challenge the introduction of other acts evidence. As a factual matter, this is simply incorrect. Defense counsel did file a response to the prosecution's motion to introduce Rule 404(b) evidence challenging the admissibility of the evidence. *See* Mot. Tr., dated 11/19/04, at 107-08. In any event, both the trial court and the court of appeals concluded that the other acts evidence was admissible as a matter of state law. In analyzing petitioner's ineffective assistance of counsel claim, this expression of state law is binding on this Court. *See Basile v. Bowersox*, 125 F. Supp. 2d 930, 960 (E.D. Mo. 1999). *See generally*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Sarausad v. Porter*, 503 F.3d 822, 824 (9th Cir. 2007) ("A determination of state law by a state appellate court is . . . binding in a federal habeas action."). Thus, any further objection by counsel would have been futile. Counsel cannot be deemed ineffective for failing to raise a meritless objection. *See Bradley v. Birkett*, 192 Fed. Appx. 468, 475 (6th Cir. 2006); *Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claims.

### c. Failure to Challenge DNA Evidence (Claim V)

Likewise, petitioner cannot show that counsel was ineffective for failing to challenge the DNA evidence. Although petitioner contends that counsel should have challenged the lack of foundation for this evidence, as explained above and as indicated by the Michigan Court of Appeals, "the polymerase chain reaction (PCR) testing method and its statistical analysis that were utilized in this case have been widely accepted by Michigan courts as reliable." *Brancaccio*, 2007 WL 189332, at *3, slip op. at 4. Further, petitioner has pointed to no facts suggesting that a proper foundation could not be established, such as problems with the laboratory's equipment or the use of improper procedures. In the absence of any such facts, petitioner cannot show that counsel was ineffective for failing to raise a foundational challenge to the evidence.

In addition, petitioner cannot show that he was prejudiced. As explained above in connection with petitioner's substantive evidentiary claim, the DNA evidence was relevant only to establish petitioner's presence and his struggle with the victim. Both of these facts, however, were well established by petitioner's own statements to the police, and were not contested at trial. Thus, petitioner cannot show that counsel was ineffective for failing to challenge the DNA evidence.

### d. Closing Argument (Claim VI)

Finally, petitioner contends that counsel was ineffective for calling him a thief, liar, and killer during closing argument. The Court should disagree. Counsel's entire closing argument was devoted to the theory that petitioner neither premeditated the killing nor committed the killing during the course of a larceny, as required to find petitioner guilty of first degree murder. Rather, counsel argued, petitioner was guilty of manslaughter or, at most, second degree murder. *See* Trial Tr., Vol. 4, at 637-57. In the course of making this argument, counsel conceded that petitioner was not innocent and was "guilty of homicide," but argued that "which degree is [the jury's] job." *Id*. at 649.

45

Counsel also argued to the jury that, "Michael is a thief. We concede that. Michael is a liar. We concede that. And Michael is a killer. We concede that. But we just have to see what kind of killing it is." *Id*. at 650-51. The Michigan Court of Appeals rejected petitioner's claim, explaining that "[w]hen defense counsel's closing argument is viewed as a whole, it is apparent that defense counsel was employing a strategy of arguing that defendant was only guilty of voluntary manslaughter, not first-degree murder." *Brancaccio*, 2007 WL 189332, at *5, slip op. at 5. Finding that this strategy was reasonable, the court rejected petitioner's claim.

The Court should conclude that this determination was reasonable. Contrary to petitioner's implicit argument, counsel's comments did not amount to a plea of guilty in violation of his Sixth Amendment rights. It is true that "counsel lacks authority to consent to a guilty plea on a client's behalf; moreover, a defendant's tacit acquiescence in the decision to plead guilty is insufficient to render the plea valid." *Florida v. Nixon*, 543 U.S. 175, 187-88 (2004) (citations omitted). Nevertheless, the Court in *Nixon* declined to equate a concession of guilt made as part of a trial strategy with a plea of guilty. In that case, defense counsel conceded his client's substantive guilt and focused on trying to spare his client from the death penalty during the sentencing phase of the proceedings. The Court rejected the defendant's claim, reasoning that despite counsel's concession, the defendant

> retained the rights accorded a defendant in a criminal trial. The State was obliged to present during the guilt phase competent, admissible evidence establishing the essential elements of the crimes with which [defendant] was charged. . . . Further, the defense reserved the right to cross-examine witnesses for the prosecution and could endeavor, as [counsel] did, to exclude prejudicial evidence. In addition, in the event of errors in the trial or jury instructions, a concession of guilt would not hinder the defendant's right to appeal.

*Id*. at 188 (citations omitted). For these reasons, the Court rejected the state court's "erroneous

equation of [counsel's] concession strategy to a guilty plea[.]" *Id*. at 189.  The Court also explained

that the normal *Strickland* standard governs the analysis of counsel's strategic decision.  *See id*. at

189-90.

        The lesson of *Nixon*, as reflected in cases decided both before and after that decision, is "that

counsel's concession of a client's guilt does not automatically constitute deficient performance."

*Young v. Catoe*, 205 F.3d 750, 759 (4th Cir. 2000).  Thus, for example, in a case involving multiple

charges "conceding guilt to one count of a multi-count indictment to bolster the case for innocence

on the remaining counts is a valid trial strategy which, by itself, does not rise to the level of deficient

performance."  *United States v. Holman*, 314 F.3d 837, 840 (7th Cir. 2002).  As the *Holman* court

explained, "[c]onceding an indefensible charge is thought to build credibility with a jury by

acknowledging the overwhelming evidence of guilt for that particular charge, creating goodwill and

trust that can be applied towards arguments attacking the remaining charges."  *Id*.; *see also*, *Clozza

v. Murray*, 913 F.2d 1092, 1099 (4th Cir. 1990) ("[T]here is a distinction which can and must be

drawn between . . . a tactical retreat and . . . a complete surrender.").  Similarly, "[a] defense

counsel's concession that his client is guilty of a lesser included offense is a legitimate trial strategy

that does not amount to the abandonment of the defendant or a failure by counsel to subject the

prosecutor's case to meaningful adversarial testing so as to amount to the denial of counsel."

*Johnson v. Warren*, 344 F. Supp. 2d 1081, 1095 (E.D. Mich. 2004) (Gadola, J.) (citing *Haynes v.

Cain*, 298 F.3d 375, 381-82 (5th Cir. 2002); *Lingar v. Bowersox*, 176 F.3d 453, 459 (8th Cir. 1999);

*Underwood v. Clark*, 939 F.2d 473, 474 (7th Cir. 1991)).

        Here, counsel's strategy amounted to a tactical retreat, not a complete surrender.  The

evidence of petitioner's involvement in the killing was overwhelming, particularly in light of

47

petitioner's multiple statements to the police. Indeed, it was petitioner himself who argued to the police that he was guilty of only manslaughter, not murder. Counsel's defense strategy merely conceded what was already obvious to everyone in the courtroom–that petitioner had killed the victim. By doing so, counsel was able to argue strenuously that the prosecution had failed to prove that petitioner premeditated or intended the killing or that he intended to steal from the victim at the time of the killing, and that the facts established only the elements of voluntary manslaughter. Such a strategy, if successful, would have reduced petitioner's sentence from a mandatory term of life imprisonment without parole, *see* MICH. COMP. LAWS § 750.316(1), to a potential maximum of 15 years' imprisonment, *see* MICH. COMP. LAWS § 750.321. In light of the evidence presented at trial, this strategy was not only reasonable, it was the only legitimate strategy available to counsel that had any hope of success. Thus, the court of appeals's application of *Strickland* was reasonable, and petitioner is not entitled to habeas relief on this claim.

I.      *Recommendation Regarding Certificate of Appealability*

1.      *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack*

48

*v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a

recommendation regarding the certificate of appealability issue here.

2.    *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability, for the reasons discussed above. There was significant evidence of petitioner's guilt of first degree murder presented at trial, significantly the circumstances of the killing which demonstrated deliberation and petitioner's own statements to the police. Thus, the resolution of petitioner's sufficiency of the evidence claim is not reasonably debatable. Likewise, there is no evidence in the record, and petitioner has pointed to none outside the record, suggesting that petitioner was legally insane at the time of the crime or that he was so intoxicated he could not form the specific intent necessary for first degree murder. Thus, the resolution of petitioner's psychiatric expert claim is not reasonably debatable. Further, the testimony of the officers at the hearing on petitioner's motion to suppress established that his statements to the police were voluntary and not taken in violation of his rights under *Miranda*, and petitioner has pointed to no evidence to rebut the testimony of these officers. Thus, the resolution of his confession related claims is not reasonably debatable. Petitioner's evidentiary claims are not cognizable on habeas review, and thus the Court's resolution of these claims is not reasonably debatable. Finally, the resolution of petitioner's ineffective assistance of counsel claims is not reasonably debatable because it is clear that (a) counsel had no basis upon which to move for dismissal of the charges based on the alleged violation of the IAD, (b) the other acts and DNA evidence were properly admitted under state law, and (c) counsel's strategy of arguing that the evidence established only voluntary manslaughter was reasonable in light of the evidence against petitioner. Accordingly, the Court should deny petitioner a certificate of

50

appealability.

J.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 3/29/11

The undersigned certifies that a copy of the foregoing
order was served on the attorneys of record and  by
electronic means or U.S. Mail on March 29, 2011.

s/Eddrey Butts
Case Manager